CHARLES C. DENNIS, APPELLANT, v. MARIAN DENNIS, APPELLEE.

137 N. W. 2d 694

Filed October 29, 1965. No. 35954.

Ellick, Spire & Ryan, for appellant.

Burbridge & Burbridge, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

The plaintiff and appellant Charles C. Dennis was granted by default a decree of divorce from the defendant and appellee Marian Dennis on January 17, 1964, by the district court for Sarpy County, Nebraska.

Thereafter on April 20, 1964, within 6 months from the entry of the decree, the defendant Marian Dennis filed a petition to vacate and set aside the decree, alleging the child custody and property settlement agreement incorporated therein was entered into through fraud, intimidation, ignorance, and passion, because of which she was coerced into entering said settlement and did not appear to contest the action. It further alleged plaintiff represented to her that if she did not sign the stipulation, or appeared to contest the divorce, she would never see her children again. It stated she was without funds to defend herself and advice of counsel when she signed the stipulation. Plaintiff Charles C. Dennis filed an answer to the petition which was in substance a general denial. At times hereafter the parties will be referred to by their first names.

On August 7, 1964, the trial court found generally in favor of the defendant Marian Dennis. It set aside and vacated the decree of divorce, the child custody, and property settlement. Custody of the minor children

was continued in the plaintiff Charles C. Dennis until the final determination of the cause, with right of reasonable visitation continued in defendant Marian Dennis. Plaintiff's motions for new trial being overruled, he has appealed to this court.

Plaintiff contends the trial court erred in vacating the decree, and its order so doing is not sustained by the evidence and is contrary to law.

Certain facts as to which there is little or no dispute will first be related. Charles and Marian Dennis were married in Council Bluffs, Iowa, August 17, 1957. Two children were born to the union, Robert Crawford Dennis and Billy Joe Dennis, aged 7 and 4, respectively, at the time of the hearing on the motion to vacate the decree of divorce. Prior to the marriage, the parties had met in the course of their employment with Ice Capades, Marian as a professional skater and Charles as a drummer. At first they toured the country, but later settled down and resided in Phoenix, Arizona, for 2 years and then moved to Bellevue, Nebraska. Marian was born in Toronto, Canada, and came to the United States when she was 18 or 19 years old. She received a high school education in Canada.

In October 1963, the parties first discussed a divorce. Afterward Charles and his brother, Joe Dennis, whom he had consulted regarding a lawyer, went together to the office of Gordon Ryan, an attorney at law, in Omaha, Nebraska, on November 1, 1963. There the questions of divorce, child custody, and a property settlement were discussed. The following day both Charles and Marian went to the same lawyer's office where the terms subsequently embodied in the written agreement were related by Charles in the presence of both. A petition for divorce for Charles to sign and a voluntary appearance for Marian were prepared. The petition was filed November 8, 1963. The voluntary appearance was mailed to the home where the parties were then living. Marian signed it November 8, 1963, before William H. Fitz-

patrick, a notary public, who was a neighbor living nearby. This was filed in court November 13, 1963. Attorney Ryan also prepared the child custody and property settlement in accordance with the terms recited by Charles in Marian's presence while they were both in his office. It was mailed to Marian who signed it before Fitzpatrick as a witness December 7, 1963, and mailed it back. The decree of divorce was entered by default. It approved the child custody and property agreement which was filed with it January 22, 1964. This provided that Charles was to have permanent custody of the children and Marian was to receive $1,000 in cash and a 1958 Chevrolet in full settlement of her property rights. The $1,000 and the car had been received by the defendant but their return was tendered at the hearing to set aside the decree.

The parties' property consisted of a home subject to a mortgage of $19,000 in which there was an equity of $3,500 to $5,000, household furniture which Marian itemized and valued generally at cost at about $5,000, and the Chevrolet automobile worth $300. Charles testified the personalty was of less value and that he owed his brother a note for money advanced for $3,000. Marian knew the extent of the property at the time of the divorce but there is a conflict in the testimony as to her knowledge concerning the note.

We will now turn to the consideration of the pertinent evidence with respect to setting aside the decree of divorce as to which there is great conflict.

Marian Dennis testified on her own behalf. She stated that in October 1963 she first suggested to Charles procuring a divorce. Charles at that time threatened her. He stated that he would get the divorce himself and he would take the children, or he would kill himself or kill her so that nobody could have them. When she was in Ryan's office, he talked with Charles and not with her. She did not understand her legal rights and feels that the attorney and Charles misled her because

she should have gotten a lawyer. After going to Ryan's office, Charles, after this meeting, again threatened her life and his own in the event she contested the divorce. He told her if she did procure custody of the children he would not help her with their support. The several threats were always made to her alone. She stated that she failed to consult a lawyer only because of her fear of Charles. She believed her husband would carry out these threats and was ignorant of her rights as a mother. He had cuffed and struck her on several occasions and once threw her down a flight of stairs, stating he would kill her. She had told her friends, Ardis Peterson and Anne Dennis of this physical abuse before the divorce and Ardis of the threats. She testified Charles became intoxicated frequently and in that condition slept in their car all night. Following the entry of the decree of divorce she became so upset it became necessary to consult Dr. J. Whitney Kelley, a neurologist.

This Dr. Kelley testified on behalf of the defendant Marian Dennis. He was consulted by her March 24, 1964. He gave her a psychiatric and a psychological examination at that time. Psychological tests that were given showed she was telling the truth. A history was related by the patient to the doctor. He spent an hour and a half trying to elicit the facts in her past which would relate to her mental state. He stated her condition presented no psychiatric problem, but one of anxiety, that she simply wanted to be reconciled with her husband so that they could bring the children up together. She had originally suggested making request for divorce herself but had been persuaded to do otherwise by the family and to have Charles file a petition because the family would be financially more able to care for the children. She was anxious but capable of making up her own mind. She did not relate any threats that had been made against her. She claimed that any financial responsibility for the children had been disclaimed by Charles if she got their custody.

There was no further testimony on behalf of the defendant and we will now review the evidence offered on behalf of the plaintiff. Marian was recalled as a witness for the plaintiff. She testified that she had known John Haizlip who was a friend of both parties. He had come to the house two or three times to assist her by giving information to be used in a speech for the Toastmistresses Club. She had coffee with him at Council Bluffs before a convention of those clubs at Shenandoah, Iowa. She had met him at a zoo and was in a car with him two or three times during the 2-months' period while the divorce was pending. She accompanied him to Pal Joey's in Ralston and at another time had bowled with him.

The plaintiff Charles Dennis testified on his own behalf. He stated that the divorce was first discussed with Marian early in the evening of October 31, 1963. He wanted to go to a minister or marriage counselor and offered to take her but she refused. She said she wanted a divorce. Charles asked, " 'What about the children?' " Marian's first response was they should go with the mother. Charles said the children were close to him, that he lived in Bellevue and his family was there, the children were in school, and he thought it best not to take them away. The talk began early in the evening but was interrupted by Charles going out with the children for their tricks and treats. In the interval Marian drove the car down town. The talk was resumed after both returned. They talked of getting a lawyer and Charles asked her if she wanted to get one. She said, " 'Well, you handle it.' " She did not want a Bellevue lawyer and suggested asking his brother, Joe, if he knew someone. She stated she would like one in Omaha so it would be as quiet as possible because she did not want any gossip. The conversation ran to 3 o'clock in the morning.

The next day Charles and Joe Dennis went to the attorney's office and told him Marian desired the divorce

and Charles was to have the children. After this meeting custody of the children was again discussed. Marian said she did not know if she could give them up and suggested splitting the custody between them. Charles objected to this and she finally agreed that they could not be separated. The next day upon both going to the attorney's office, Charles told the lawyer in Marian's presence that it was agreed that he should have the children, and that they felt if Marian received $1,000 and the car that was a fair settlement. He testified he originally did not want a divorce but had made an adjustment and no longer desired a reconciliation.

Charles denied having struck, pushed, or hit Marian and further denied that he had threatened her with physical violence, or telling her she would never see the children again if she opposed the divorce. On occasion he had been intoxicated, but only infrequently, and denied it ever resulted in sleeping in the car as claimed. He stated Marian had told him early in January 1964 that she was going to get a lawyer and take the children. He then told her he was going ahead with what he was doing and she could do as she wished.

Phyllis James, the wife of the high school football coach at Bellevue, appeared as a witness for Charles. She had been acquainted with both parties 2 or 2½ years prior to November 1963. On November 2, 1963, she received a phone call from Marian. Marian asked her if she had heard a rumor around high school that she was "having an affair, or going out, or something," with Mr. Haizlip. Phyllis replied she had heard no such rumor and asked what the trouble was. Marian stated over the phone they were going to get a divorce. Phyllis asked if it would help if she came over and talked with her, and Marian said, " 'If it's all right with Charles.' " Phyllis thereupon went to their home and the matter was discussed in the presence of both parties and Phyllis from 8 o'clock p.m., until 12:30 the next morning. Marian stated she wanted a divorce and gave

as her reason that she did not love Charles and doubted if she ever had. During the conversation Marian appeared composed but Charles was upset and, in fact, cried. Marian said she was giving up the children and Phyllis advised against it. Marian said that was their home, the oldest boy was in school, they would be better off financially, and she thought it best for their sake. Marian stated she knew that she could get them if she wanted to. Phyllis suggested a trial separation.

Norma Cleary, called on behalf of Charles, testified she was a roommate of Marian from November 15, 1963, to January 17, 1964. Marian had called her by phone and asked to live with her, and Norma had assented to the arrangement. Marian was then working, selling trip insurance at the airport. Before coming to live with her, Marian came to look at the apartment. Marian then said that they both felt it would be best for the children to be with Charles. He would be more able financially to take care of them and one child was in school. She never related any threats or intimidation to Norma. While living with her, Marian gave no indication of insomnia or sleeplessness. She did not cry but appeared relaxed and happy.

Anne Dennis, who testified for Charles, was the wife of his brother. She told of being acquainted with both parties since 1956 and of seeing Marian since July 1963 socially approximately once a week. These visits continued up to the time of the divorce and afterward. She related conversations between herself and Marian relative to the custody of the children of the parties. She said she advised Marian against giving up her children. Marian's response was to the effect that she and Charles had decided it was best for the children to stay with Charles. In one conversation, however, Marian had expressed an inclination to get a lawyer and take the children if Charles did not stop bucking her. She said Marian had never told her of any physical violence, or threats of violence. On cross-examination she was asked

if she remembered telling Marian that Charles would kill her if he did not get the children. She testified she had not said that, but had said, "* * * that wives have been killed for less, and that she should be careful, because you never knew what a husband would do."

Gordon Ryan was called as a witness for Charles and it was stipulated by Marian's counsel that he might testify although he was also acting as opposing attorney. He related that the details of the child custody and property settlement were outlined by Charles in Marian's presence. Ryan then asked Marian if this was so and she answered that it was. He told her that he did not represent her in any way and she had a right to have counsel. He later drafted the written agreement and forwarded it by mail. It was subsequently signed and returned by mail. The voluntary appearance was handled in the same manner.

John Haizlip was called as a witness for Charles. The court permitted his examination as a hostile witness. He had previously given testimony by deposition. The witness had known both of the parties prior to the divorce. He had called at the home on certain occasions while assisting Marian in preparing a talk to be given at the Toastmistresses meeting to be held at Shenandoah, Iowa. He had been with her for coffee on occasion. They had gone to the zoo together with the children, to the Leisure Lanes to bowl, and to Pal Joey's, a night club at Ralston. They had met on the occasion of her going to Shenandoah to the Toastmistresses meeting and had gone to Council Bluffs for coffee. He thought they had met seven or eight times while the divorce was pending, generally at Howard Johnson's in Council Bluffs or the Union Station. Some of the meetings were arranged by phone. To prevent gossip he never picked her up at her home. He was only Marian's friend and there was no love interest between them. He had taught school 3 years in Bellevue and then had a promise of a contract in California.

This court has considered several cases involving the vacating and setting aside of a decree of divorce on application of a party within the period of 6 months from decree. In Firebaugh v. Firebaugh, 163 Neb. 79, 77 N. W. 2d 891, this court in its syllabi held: "The district court may at any time within 6 months of the trial and decision of a divorce case, if no appeal is taken therefrom, vacate or modify the decree therein.

"The right to vacate or modify a decree of divorce within 6 months of the trial and decision of the cause is not absolute but must be exercised within a sound discretion.

"In order that it may be said that the court exercised a sound judicial discretion in vacating or modifying a decree of divorce good reason therefor must be shown and it must also appear that such action did not produce an unconscionable result."

It was also held: "It is the duty of this court, on appeal of proceedings to modify a decree of divorce, to try it de novo on the record and to reach a conclusion uninfluenced by what was done by the trial court, except if there is irreconcilable conflict in the evidence the court may consider that the trial court saw the witnesses and accepted one version of the facts."

In Willie v. Willie, 167 Neb. 449, 93 N. W. 2d 501, the following rules were stated: "The petitioner or moving party who seeks to vacate a divorce decree has the burden of proving the grounds charged, including the falsity of allegations of residence within the jurisdiction of the court by a preponderance of evidence, and where this burden is not sustained, a refusal to vacate the decree is proper. * * *

"It is the spirit and policy of the law to give every party an opportunity to prosecute or defend his case in court, and courts will not ordinarily deny such right except for the fault or gross laches of such party or his authorized attorney.

"What constitutes good reason for setting aside such a

decree or what constitutes an unconscionable result prohibiting it depends upon the facts and circumstances of each particular case.

"Where a default has been regularly entered, it is largely within the discretion of the trial court to say whether the defendant shall be permitted to come in afterwards and make his defense and, unless an abuse of discretion is made to appear, this court will not interfere."

In the case before us the defendant's counsel calls attention to the decision of the trial court in setting aside the decree and contends that this court has always given great weight to the trial court's action. It is quite clear, however, from the rules cited that the matter comes to this court for trial de novo.

The petition to vacate alleged fraud, threats, and intimidation, together with deprivation or lack of counsel. The burden was upon defendant to prove the grounds relied upon. Her testimony with respect to abuse, threats, and intimidation rests entirely on her unsupported evidence. It is directly contradicted by that of Charles. Her visit to Dr. Kelley, she claims, occurred when she was in a state of doubt, confusion, and frustration, arising from fear of Charles. It is of great significance that Dr. Kelley was unable to relate anything in her history indicating abuse, threats, or fear although he spent an hour and a half endeavoring to elicit the cause of her anxiety. Marian had many personal contacts without the home and if she had been abused, threatened, and intimidated it would appear remarkable indeed if she had not related the situation to her roommate, Norma Cleary, and her friends, Phyllis James or Anne Dennis. If she dwelled in constant fear it would have been foremost in her mind. Marian also said she confided greatly in her friend, Ardis Peterson, who did not testify.

The alleged threat of Charles to leave Marian without support or provision to care for the children could

have only influenced her if she was entirely without understanding of her legal rights. Both Phyllis James and Anne Dennis related conversations with Marian which indicated she understood her rights. Marian was 29 years old and had been married 7 years. She had traveled through the United States with the Ice Capades and earned her own way. She had friends with whom she was in constant contact. It appears incredible that during repeated meetings with Norma Cleary, Phyllis James, and Anne Dennis, as well as Ardis Peterson, John Haizlip, and other persons with whom she was on a footing of friendship, her legal rights were not suggested to her and that she was so unsophisticated as not to understand them.

Charles testified he had asked Marian if she desired to procure an attorney. Attroney Ryan said she was informed he did not represent her and she had the right to procure counsel. The voluntary appearance and the custody and property agreement were not signed in his presence, but mailed from and returned to his office after being signed before others. The testimony of Phyllis James and Anne Dennis tends to show she knew her legal rights, and their statements and that of Norma Cleary clearly indicate her conduct gave no indication of fear or restraint.

Considering the evidence de novo as we are required to do, we conclude that Marian Dennis failed to prove by a preponderance of the evidence that she was coerced by fear, threats, or intimidation in entering into the child custody and property agreement. Neither was it shown she was ignorant of her right to counsel had she desired such. Indeed it appears that Marian desired the divorce and freely consented to the agreement regarding the custody of the children and property settlement in order that it be procured at that time. After the decree approving the settlement, she changed her mind and desired that matter be tried anew. Such conduct is an imposition on the time of the trial court and

should not be permitted unless the evidence shows some injustice has occurred.

It follows that the trial court was in error in setting aside the decree of divorce and the child custody and property settlement, and its judgment must be and is reversed and the cause remanded with direction to dismiss the defendant's petition to vacate the decree of divorce.

REVERSED AND REMANDED WITH DIRECTIONS.